Fletcher McDANIEL, et al., Plaintiffs,

v.

ARMSTRONG WORLD INDUSTRIES, et al., Defendants.

Civ. A. No. 83–3520.

United States District Court, District of Columbia.

March 14, 1985.

Michael P. Chervenak, Rockville, Md., for Armstrong World Industries.

Kevin J. McCarthy, Upper Marlboro, Md., for A.C. & S., Inc.

H. Patrick Donohue, Rockville, Md., for Atlas Turner, Inc., & Bell Asbestos.

David P. Durbin, Washington, D.C., for Celotex Corp.

R.G. Guziak, Washington, D.C., for Nicolet, Inc.

Hopewell H. Darneille, III, Richard H. Saltsman, Washington, D.C., for Turner & Newall, PLC.

Brock R. Landry, Washington, D.C., for U.S. Gypsum Co.

Edward J. Lopata, Washington, D.C., for W.R. Grace Company.

Patrick James Attridge, Rockville, Md., for U.S. Mineral Products Co.

Louis R. Moffa, Jr., Washington, D.C., for National Gypsum Co.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter is before the court on the motions to dismiss filed by defendants Turner & Newall PLC ("T & N") and Nicolet, Inc. ("Nicolet"), and the motion of defendants Atlas-Turner, Inc. ("Atlas"), and Bell Asbestos Mines, Ltd. ("Bell") to dismiss or, in the alternative, for summary judgment. These motions allege that this court lacks personal jurisdiction over these defendants.

## BACKGROUND

Plaintiff Fletcher McDaniel was employed from 1950 to 1982 as a plasterer's helper. He alleges that he worked at various job sites in and around the District of Columbia where he was exposed to asbestos and asbestos-containing materials. As a direct result, plaintiff claims, he contracted a pulmonary disease. The defendants are manufacturers, suppliers and sellers of asbestos and asbestos-containing products with which plaintiff alleges he came into contact. Plaintiff further alleges that defendants were negligent and failed to warn him of known dangers. He also sues on the theories of strict liability and breach of warranties. Plaintiff asserts that he was diagnosed as having this pulmonary disease in 1983. The intricate corporate structure involved in this case and its changing nature over time are critical in determining whether this court can exercise personal jurisdiction over these defendants. Significantly, none of the defendants has taken issue with plaintiffs' description of the corporate structure and distribution scheme involved in this case.

Turner & Newall was formed in 1920 through a merger of several United Kingdom manufacturers of asbestos-containing products, one of which was J.W. Roberts, Ltd. J.W. Roberts continued to function as a branch of T & N. In 1934, T & N acquired Atlas Asbestos Co., a Canadian corporation. In 1936, T & N completed the acquisition of Keasbey and Mattison Company ("K & M"), located in Ambler, Pennsylvania. Keasbey and Mattison owned Bell Mine in Thetford, Quebec. In 1937, T & N formed a wholly owned subsidiary, Bell Asbestos Mines, Ltd., for the purpose of acquiring Bell Mine.

By 1950, Keasbey and Mattison was manufacturing a wide range of asbestos-containing products. By that same year, T & N's distribution chain was so firmly en-

trenched that T & N informed its shareholders that Keasbey and Mattison distributors:

now embrace all the major trading areas of the nation, and serve to place the various Keasbey and Mattison products virtually at the doorsteps of retailers and ultimate users throughout the United States.

Turner & Newall brochure at 39 (quoted in Plaintiffs' Brief in Opposition to Defendant Turner & Newall PLC's Motion to Dismiss at 5).

In the 1930's, J.W. Roberts, a company for which T & N does not deny responsibility, developed a product known as Sprayed Limpet Asbestos. The manufacturing process took place in England and the product was distributed through a series of exclusive license agreements. Initially, J.W. Roberts granted Keasbey and Mattison the right to distribute Limpet in the United States. In the late 1950's, Keasbey and Mattison entered into a sublicensing agreement with National Asbestos Co. ("National"), one of the companies for which Mr. McDaniel worked, for the Sprayed Limpet Asbestos process. National's territory under this agreement included the District of Columbia, and under this agreement, National regularly applied Sprayed Limpet Asbestos in buildings located in the District of Columbia.

In 1962, after selling Keasbey and Mattison, T & N, through J.W. Roberts, granted Armstrong Contracting and Supply Company an exclusive license for the Sprayed Limpet Asbestos process in the United States. Armstrong entered into a sublicense agreement with Krafft-Murphy to sell Limpet in an area that expressly included the District of Columbia. This sublicense agreement was subject to T & N's approval. Krafft-Murphy employed the plaintiff, Mr. McDaniel. T & N shipped Limpet for use in the District of Columbia to ports in Maryland and New Jersey. The Limpet was trucked from the ports to a Krafft warehouse or delivered directly to District of Columbia construction sites.

In 1967, the license held by Armstrong was transferred to Atlas Asbestos Co., an internal division of T & N's wholly owned subsidiary, Bell. In addition to being the licensee for the distribution of Limpet in the United States, Atlas manufactured Limpet. Most of the asbestos fiber used by Atlas in the manufacturing process was supplied by a subsidiary of T & N. The sublicense with Krafft-Murphy was also transferred from Armstrong to Atlas. Thereafter, Krafft-Murphy applied Limpet in buildings located in the District of Columbia throughout the period it served as sublicensee. Atlas frequently shipped Sprayed Limpet Asbestos ordered by Krafft-Murphy directly to District of Columbia jobsites by truck from Canada. On other occasions shipments were made to the Keasbey and Mattison warehouse in Virginia. In 1977 Atlas Asbestos Company became a separate corporate entity and changed its name to Atlas-Turner, Inc.

Defendants do not dispute the facts as set out above in any of their essentials. Defendant Turner & Newall contends that its lack of *present* contacts with the forum puts it out of the reach of the D.C. long-arm statute. Alternatively it argues that to find that this court can exercise personal jurisdiction over it would be a violation of due process. Defendants Atlas and Bell deny that this jurisdiction's long-arm statute covers their activities, and argue, that if it does, they have no minimum contacts with the District of Columbia. Defendant Nicolet argues that jurisdiction cannot be found over it on the basis of the activities of Keasbey and Mattison.

## DISCUSSION

■ In order for this court to find that it can exercise jurisdiction over these defendants it must make a two-pronged inquiry. First, the court must determine whether the D.C. long-arm statute permits the exercise of jurisdiction over these defendants. If so, then the court must inquire whether the exercise of jurisdiction over these defendants comports with constitutional due

process requirements. *Gatewood v. Fiat, S.p.A.*, 617 F.2d 820, 823 (D.C.Cir.1980).[1]

The D.C. long-arm statute provides in pertinent part:

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—

(1) transacting any business in the District of Columbia;

(2) contracting to supply services in the District of Columbia;

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

. . . .

(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

D.C.Code Ann. § 13–423 (1981)

Plaintiffs seek to assert jurisdiction over these defendants relying primarily on sections (a)(1), the "transacting business" prong of the long-arm statute, and (a)(4), the "tort without, injury within," prong of the long-arm statute. Plaintiffs rely principally on the "stream of commerce" theory of personal jurisdiction, under which it is held to be within this forum's long-arm statute and within the bounds of due process for a court to exercise personal jurisdiction over a corporate defendant if that defendant willingly causes items to be marketed in the forum.

Plaintiffs believe that this circuit's decision in *Stabilisierungsfonds Fur Wein v. Kaiser-Stuhl*, 647 F.2d 200 (D.C.Cir.1981), is dispositive of the case at bar. The defendants in *Kaiser-Stuhl* were Barossa, an Australian corporation that produced wine; Kaiser-Stuhl, its wholly owned Australian subsidiary; Victoire and Peartree, its two exclusive United States importers; and A & A Liquors, a District of Columbia liquor store. *Id.* at 202. The court found that the Australian defendants were subject to jurisdiction under section (a)(1) and alternatively under section (a)(4). *Id.* at 204, 206.

Initially, the court examined subsection (a)(1) and found that these foreign defendants were transacting business in the District of Columbia. It stated:

We are convinced that when the "transacting any business" language is read to extend to the limits of due process, it encompasses a case like the present one where a nonresident defendant ships goods to an intermediary with the expectation that the intermediary will distribute the goods in a region that includes the District of Columbia.

*Id.* at 205.

### A. Defendants Turner & Newall PLC, Atlas and Bell

 This court believes that except for the period of time that has elapsed between the last time the stream of commerce flowed into the District and the filing of this lawsuit, *Kaiser-Stuhl* would be dispositive of the current case. At no point have defendants Turner & Newall, Atlas, or Bell sought to distinguish their distribution scheme from that in *Kaiser-Stuhl* except to argue that both Krafft-Murphy and National were non-D.C. corporations which unilaterally brought T & N asbestos into the District after sales to them that did not take place in the District. The court rejects this argument that the acts of Krafft-

---

1. There are cases in this jurisdiction that suggest that because the transacting business prong is coextensive with due process, a court can proceed directly to the constitutional issue. *See Hummel v. Koehler*, 458 A.2d 1187, 1190 (D.C. 1983); *Smith v. Jenkins*, 452 A.2d 333, 336 (D.C. 1982). Because the matter is not entirely free from doubt, however, the court will analyze the case using the two-step approach while noting that the result would be the same had it considered only the constitutional issue.

Murphy and National in bringing the asbestos into the District and applying it and presumably selling it here, were actions which served to break the flow of the stream of commerce.[2] These companies were sublicensees approved by T & N and, as the record clearly demonstrates with respect to Krafft-Murphy, whose sublicense agreements expressly included the District of Columbia as a territory for the application of Sprayed Limpet Asbestos. The record further reveals that, as contemplated by these agreements, Sprayed Limpet Asbestos was applied in numerous buildings in the District of Columbia. Thus, the fact that the asbestos was ultimately applied in buildings here was not a fortuitous event, but was affirmatively welcomed by defendants. *See Kaiser-Stuhl, supra*, at 205.

Defendants claim that unlike *Kaiser-Stuhl* there is not a nexus between the transaction of business and the claim here sufficient to satisfy D.C.Code § 13–423(b) which requires that when jurisdiction over a person is based on § 13–423, which includes the transacting business prong,

"only a claim for relief arising from acts enumerated in this section may be asserted." Defendants' argument is that an asbestos injury that arises from the placement of those products in the stream of commerce does not arise from the transaction of business. The court disagrees. This is not a case in which a plaintiff injured by product A, sues a defendant based on its transaction of business within a forum with regard to product B. It is indisputable that if Mr. McDaniel was injured by the defendants' asbestos products, and if the defendants were transacting business within this jurisdiction with respect to those products, then the McDaniels' claim arises from the defendants' transaction of business in the District of Columbia.[3]

At oral argument Turner & Newall claimed that the (a)(1) prong cannot apply to tortious injuries that arise from transacting business because to so apply it would render the prongs that do deal with tortious conduct redundant. This court finds nothing in District of Columbia law that suggests that the "arising from" language should be limited solely to contract

2. To support the connection of these license agreements with the District of Columbia plaintiffs have supplied the affidavit of Richard W. Boyle, Secretary-Treasurer of the Krafft-Murphy Company. In his affidavit he explains that the National Asbestos Company ("National") was formed in the 1950's by the stockholders of Krafft-Murphy and that National shared office space and wharehouse space with Krafft-Murphy. He declares that while the sublicense with Keasbey and Mattison was in effect National "regularly applied Sprayed Limpet Asbestos in buildings located in the District of Columbia." Boyle Affidavit at %%%7¶ 4–6. In the early 1960's the activities of National were absorbed in one company called Krafft-Murphy. The Boyle affidavit declares that while the sublicense agreement with Armstrong was in effect Krafft-Murphy regularly applied Sprayed Limpet Asbestos in buildings in the District of Columbia. *Id.* ¶ 13. After the Armstrong license was assigned to Atlas, the Boyle affidavit declares that Krafft-Murphy continued to apply Limpet in the District of Columbia, and that this asbestos was ordered from Atlas in Canada. *Id.* ¶ 19. It appears reasonable to characterize Krafft-Murphy and National's transactions in the District of Columbia as sales when they contracted to apply Limpet here. Counsel for plaintiffs have so characterized the activities of

Krafft-Murphy and National. *See* Plaintiffs' Reply to Defendant Turner & Newall PLC's Supplemental Memorandum in Support of Motion to Dismiss at 6. ("uncontested factual record in this case ... establishes that T & N's *approved* distributor, Krafft-Murphy, sold T & N's Limpet in the District of Columbia for a period spanning three decades"). The Boyle affidavit does not use the precise word "sale," but the court finds that the activities he describes are sufficient to come within the transacting business prong as analyzed in *Kaiser-Stuhl.*

3. Courts in other jurisdictions which have similar "arising from" language in their long-arm statutes have used various verbal formulas which support a view that the claim here arises from the defendants' transaction of business here. Illinois courts, for example, require that the claim "lie in the wake" of the defendant's commercial activities. *Jacobs/Kahan & Company v. Marsh*, 740 F.2d 587, 591 (7th Cir.1984) (applying Illinois law); *Wimmer v. Koenigseder*, 128 Ill.App.3d 157, 83 Ill.Dec. 368, 470 N.E.2d 326, 329 (1984). There can be little doubt that Mr. McDaniel's injuries if found to have been caused by the exposure to defendants' products lie in the wake of the defendants' decision to market asbestos products in the District of Columbia.

actions as defendants suggest. Such a limitation would be especially odd in light of the fact that the highest court of the District of Columbia has already ruled that the transacting business prong is coextensive with the due process clause. *Hummel v. Koehler,* 458 A.2d 1187, 1190 (D.C.1983) (citing *Mouzavires v. Baxter,* 434 A.2d 988, 991, 992 (D.C.1981), *cert. denied,* 455 U.S. 1006, 102 S.Ct. 1643, 71 L.Ed.2d 875 (1982)). In fact recent cases of the District of Columbia Court of Appeals suggest that the "transacting any business" prong is met as long as there are minimum contacts with the forum. *See Hummel, supra,* at 1190; *Smith v. Jenkins,* 452 A.2d 333, 336 (D.C. 1982). Further, there may be cases in which, for example, tortious conduct outside the jurisdiction with an effect within could not be brought under (a)(1) because the claim does not arise out of the transacting of business here.[4] In any event, there is no discernible principle which suggests that the various prongs of the long-arm statute were meant to be mutually exclusive. In *Kaiser-Stuhl,* for example, the court found alternative bases upon which the exercise of personal jurisdiction in that case could be justified. 647 F.2d at 204, 206. Finally, courts have had no trouble in finding that torts can arise from the transaction of business. *See Wimmer v. Koenigseder,* 128 Ill.App.3d 157, 83 Ill.Dec. 368, 470 N.E.2d 326 (1984); *Mohamed v. Michael,* 279 Md. 653, 370 A.2d 551 (1977); *State ex rel. Newport v. Wiesman,* 627 S.W.2d 874 (Mo.1982) (en banc).[5] Thus, there is no reason to restrict jurisdiction based on the transacting business prong only to contract actions.

Having determined that this action arises from the transaction of business of defendants Turner & Newall, Atlas, and Bell, the court next considers what effect, if any, the lack of contacts for over twelve years should have on the analysis of jurisdiction under (a)(1). The court finds that this factor does not remove this court's power under the long-arm statute to exercise jurisdiction over these defendants. First, the plain language of section (a)(1) does not require that the transaction of business occur at the time the suit is filed. Rather, (a)(1) is satisfied if the *claim* arises from the transacting of business. As discussed above, the court has found that this claim does so arise, and thus the exercise of jurisdiction is within the plain meaning of the statute. The question remains, however, whether the exercise of jurisdiction in this case under (a)(1) comports with the requirements of due process. The court finds that it does.

In determining whether the exercise of personal jurisdiction in a particular case violates due process, the Supreme Court has provided broad guidance which centers the court's inquiry on whether the assertion of jurisdiction comports with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The focus for application of this broad standard has been to consider whether there are "minimum contacts" between the defendant and the forum state. *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158, *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). In a products liability situation the "defendant's conduct and connection with the forum [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567. In determining whether a particular exercise of jurisdiction is consistent with due process, the inquiry must focus on "the relationship among the defendant, the forum, and the litigation." *Rush v. Savchuk,* 444 U.S. 320, 327, 100

---

4. The stream of commerce theory may narrow the range of cases in which resort by a plaintiff to the (a)(4) prong will be necessary in order to support personal jurisdiction, but that reality in no way affects a determination whether (a)(1) should apply in a given case.

5. "Decisions applying Virginia and Maryland law are persuasive authority in the District of Columbia since Congress modeled the District's long-arm statute on the statutes of those neighboring states." *Kaiser-Stuhl, supra,* at 205 n. 13.

S.Ct. 571, 577, 62 L.Ed.2d 516 (1980) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977)). As the Supreme Court explained in *World-Wide Volkswagen:*

> Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute ...; the plaintiff's interest in obtaining convenient and effective relief ... at least when that interest is not adequately protected by the plaintiff's power to choose the forum; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social polices....

444 U.S. at 292, 100 S.Ct. at 564 (citations omitted). Even with these guiding concepts, however, it is still true that "the constitutional standard is easier to state than to apply." *World-Wide Volkswagen,* 444 U.S. at 313, 100 S.Ct. at 568 (Marshall, J., dissenting).

██ The crux of defendants' due process complaint is that it would violate due process to look to the time of the injury rather than to the time of the commencement of litigation in determining whether the defendants had minimum contacts with this forum.[6] Defendants assert that they have had no contact with this forum for a substantial amount of time—some twelve or so years—and thus should not be haled into court here. This complaint, however, which seems reasonable at first blush, sounds more like an argument that should be addressed to the issue of how a statute of limitations should be applied. But the issue before the court is one of personal jurisdiction, and in such a case the basic question is whether the connection between the defendant, the forum and the litigation renders it fair to hale these defendants into court in this forum. The court believes the exercise of personal jurisdiction against defendants Turner & Newall, Atlas, and Bell does comport with due process.

██ Defendants, in effect, are arguing that in addition to considering the relationship among the litigation, the forum and the defendant, a court must take an additional step and be sure that there are continuing contacts with the forum at the time the suit is filed. This court does not read the Supreme Court's decisions as requiring any such mechanical approach to the question of fairness. In fact, any such requirement was conspicuously absent in *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), where, in upholding the exercise of jurisdiction over the defendant insurance company, the Court declared: "It is sufficient for purposes of due process that the suit was based on a contract which *had* substantial connection with that State." 355 U.S. at 223, 78 S.Ct. at 201 (emphasis added). The Court then added: "The contract *was* delivered in California, the premiums *were* mailed from there and the insured *was* a resident of that state when he died." 355 U.S. at 223, 78 S.Ct. at 201 (emphasis added). Defendant Turner & Newall contends that the Supreme Court in its more recent personal jurisdiction cases such as *World-Wide Volkswagen, supra,* and *Rush v. Savchuk, supra,* has retreated somewhat from the expansive approach taken in *McGee* to the question of contacts. But none of the cases since *McGee* has added a requirement to the due process analysis that there be contacts at the time the suit is filed.

---

**6.** Absent the problem of timing presented here, this court would have no difficulty concluding that the exercise of jurisdiction over these defendants comports with due process. The point was conceded in *Kaiser-Stuhl,* 647 F.2d at 203, and other courts faced with similar distribution schemes have found the exercise of personal jurisdiction to be within the scope of due process requirements. *See, e.g., Bean Dredging Corp. v. Dredge Technology Corp.,* 744 F.2d 1081 (5th Cir.1984); *Nelson by Carson v. Park Industries, Inc.,* 717 F.2d 1120 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1277–78, 79 L.Ed.2d 682 (1984).

The cases upon which Turner & Newall rely to support the proposition that contacts must be measured at the time suit is filed are not helpful to this court. In none of those cases was the issue squarely before the court, and, in any event, the cases provide little or no analysis to support such a conclusion. *See Connecticut Artcraft Corp. v. Smith,* 574 F.Supp. 626, 630 (D.Conn.1983); *Lachman v. Bank of Louisiana in New Orleans,* 510 F.Supp. 753, 757 (N.D.Ohio 1981); *In re Puerto Rico Air Disaster Litigation,* 340 F.Supp. 492, 498 & n. 19 (D.P.R.1972); *Henson v. Fred Harvey, Inc.,* 308 F.Supp. 218, 219 (E.D.Pa. 1970); *Optico Corp. v. Standard Tool Co.,* 285 F.Supp. 46, 48 (E.D.Pa.1968); *Proler Steel Corp. v. Luria Brothers & Co.,* 225 F.Supp. 412, 413 (S.D.Tex.1964). Rather, for reasons stated above, the court finds more persuasive cases that have taken a view contrary to that in cases relied on by Turner & Newall here. *See Boeing Co. v. Spar Aerospace Products, Ltd.,* 380 F.Supp. 101, 106 (E.D.Pa.1974); *Johnston v. Gilley,* 50 N.C.App. 274, 273 S.E.2d 513, 516 (1981); *Collins v. Mize,* 447 S.W.2d 674, 675–6 (Tex.1969). To exercise personal jurisdiction over these defendants comports with the central reasoning of *International Shoe:*

> [T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

326 U.S. at 319, 66 S.Ct. at 160. Although the obligations that defendants incurred as a result of their transacting business within the District of Columbia are just now being called due, the timing of this suit does not alter the fact that the claim being brought here is intimately connected with this forum since this is where the alleged injury took place, and the injury allegedly arose out of the defendants' transaction of business here as that term has been applied in *Kaiser-Stuhl.* Further, the District of Columbia clearly has an interest in providing a forum for its citizens when injuries manifest themselves after a corporate defendant has ceased activities which relate to the District of Columbia. This is not a case in which a plaintiff brings a claim based on a recently suffered injury and comes to the forum claiming personal jurisdiction based on ancient contacts that do not relate to the injury; rather, here the injury was allegedly occurring simultaneously, for the most part, with the contacts on which plaintiffs seek to invoke the personal jurisdiction of this court. Thus, considering the relationship among the defendant, the forum and the litigation, this court concludes that it comports with "traditional notions of fair play and substantial justice" to hale a defendant into court in the place where it transacted business at the time the injury complained of was taking place and where the injury arose from the defendants' transaction of business.[7]

## B. Defendant Nicolet

■ The court reaches a different conclusion with respect to defendant Nicolet. Plaintiffs have not argued here that Nicolet also participated in the distribution scheme that brought the products into this jurisdiction. Nor have they argued that Nicolet's own contacts with the District of Columbia bring this defendant within the reach of the D.C. long-arm statute. Rather, plaintiffs have stated the legal conclusion that defendant Nicolet is the successor in interest to Keasbey & Mattison, a company over which the court could have asserted jurisdiction under the theory outlined earlier in this Memorandum Opinion. While in considering a motion to dismiss

---

**7.** *See also Restatement (Second) of Conflict of Laws* § 48 (1971) ("A state has power to exercise judicial jurisdiction over a foreign corporation which has done business in the state, but has ceased to do business there at the time when the action is brought, with respect to causes of action arising from the business done in the state").

for lack of personal jurisdiction, the court may be required to resolve factual issues in favor of the party asserting jurisdiction, the plaintiffs have cited no case, and indeed there would be no case, that says the court must resolve legal issues in its favor. With respect to defendant Nicolet the plaintiffs have simply not met their burden of establishing a prima facie case of jurisdiction.

The crux of their jurisdictional claim against Nicolet is that it acquired the Industrial Products Division of Keasbey and Mattison, the division which manufactured Sprayed Limpet Asbestos, and therefore, as successors in interest, the court can use the contacts of K & M to exercise jurisdiction over Nicolet. In papers submitted to this court supported by affidavits, defendant Nicolet has declared "... that sprayed limpet asbestos was not part of the product line of the K & M Industrial Products Division when purchased by Nicolet, and that Nicolet has never, in fact, distributed a sprayed limpet asbestos product or any similar type sprayed asbestos product." Response of Defendant, Nicolet, Inc. to Plaintiffs' Recent Notice of Filing in Support of Plaintiffs' Opposition to Pending Motions to Dismiss at 3 (filed June 4, 1984). At oral argument, plaintiffs did not suggest that it would contest this fact but rather pointed to the fact that Nicolet distributed asbestos-containing products using the Keasbey and Mattison logo. Transcript of Oral Argument, June 5, 1984 at 42. Significantly, the plaintiffs here have not attempted to assert jurisdiction over Nicolet based on exposure to any of Nicolet's products after the acquisition of assets of K & M, but rather rely solely on the activities of K & M with regard to Sprayed Limpet Asbestos.

This court need not here decide whether it is ever possible to use the successor in interest theory as a tool to assert personal jurisdiction because plaintiffs have not here adduced enough facts to bring within due process bounds the assertion of personal jurisdiction over defendant Nicolet. The court will grant Nicolet's motion to dismiss for lack of personal jurisdiction.

An appropriate Order accompanies this Memorandum Opinion.

### ORDER

This matter is before the court on the motions to dismiss of defendants Turner & Newall PLC, and Nicolet, Inc., and the motion of defendants Atlas-Turner, Inc. and Bell Asbestos Mines, Ltd. to dismiss or, in the alternative, for summary judgment. For the reasons stated in the accompanying Memorandum Opinion, it is, by the court, this 13th day of March, 1985

ORDERED that the motion to dismiss of defendant Turner & Newall PLC is hereby denied; and it is further

ORDERED that the motion to dismiss of defendant Nicolet, Inc. is hereby granted; and it is further

ORDERED that the motion to dismiss of defendant Atlas-Turner, Inc. is hereby denied; and it is further

ORDERED that the motion to dismiss of defendant Bell Asbestos Mines, Ltd. is hereby denied; and it is further

ORDERED that because defendant has not demonstrated to this court that it can decide the issue of liability as a matter of law, the motion of defendant Atlas-Turner, Inc. for summary judgment is hereby denied; and it is further

ORDERED that because defendant has not demonstrated to this court that it can decide the issue of liability as a matter of law, the motion of Bell Asbestos Mines, Ltd. for summary judgment is hereby denied.